[Civ. No. 13190. First Dist., Div. One. Mar. 12, 1952.]

THE PEOPLE, Respondent, v. SPRING VALLEY COMPANY, LTD. et al., Defendants; OCEAN SHORE RAILROAD COMPANY (a Corporation) et al., Appellants.

A. P. Black, Eli D. Langert, Erskine & Erskine, Nichols & Richard and Edwin H. Williams for Appellants.

Fred N. Howser and Edmund G. Brown, Attorneys General, Everett W. Mattoon, Assistant Attorney General, Holloway Jones and Jack M. Howard for Respondent.

BRAY, J.—Defendants appeal from an order denying their motion for change of place of trial from San Mateo County to Alameda County.

### QUESTIONS PRESENTED

1. Did the court abuse its discretion in denying the motion subject to a renewal at the time of trial? 2. Is res judicata applicable? 3. Does section 394 of the Code of Civil Procedure require a change of place of trial? 4. Effect of alleged disqualification of judges.

### RECORD

Eight other cases were consolidated for trial with the above-entitled case. Each of the nine was filed in San Mateo County and is an action brought by the People of the State of California, acting by and through the Department of Public Works, to condemn respective portions of the right of way now or formerly owned by the Ocean Shore Railroad Company. The first action was filed April 1, 1935, and the

others at various times up to December 9, 1942, when the last action was filed. The last answer was filed June 17, 1944. The notice of motion for change of place of trial in the consolidated cases was filed April 10, 1945.

The hearing on the motion to change venue was had before Honorable Andrew R. Schottky, assigned, on affidavits, court records, documentary evidence, including newspaper clippings, and the transcript of the evidence on which Judge Trabucco in the Mussel Rock case (hereafter referred to) granted the motion to change venue. The motion was made on the grounds (1) that there was reason to believe that an impartial trial could not be had in San Mateo County; (2) convenience of witnesses; and (3) that section 394 of the Code of Civil Procedure requires such change. The motion was denied July 23, 1945.

### BACKGROUND OF CASE

The Ocean Shore Railroad Company was organized in 1904. From 1905 to 1909 it was engaged in constructing a railroad from San Francisco to Santa Cruz, a distance of 75 miles. The right of way for the entire distance was obtained and the grading completed. However, due to lack of finances, a gap of some 26 miles in the center was never completed. The two ends were operated as a railroad from 1909 to 1920. Late that year a group of men headed by Selah Chamberlain, and known as the Selah Chamberlain Associates, secured an option to purchase the railroad company and all of its roadbed. Litigation then ensued between the railroad and the Spring Valley Water Company and others over a portion of the right of way, the water company claiming that the right of way over its lands had reverted to it. The railroad succeeded in finally quieting its title thereto. (See *Ocean Shore R. R. Co.* v. *Spring Valley W. Co.*, 87 Cal. App. 188 [262 P. 53].) In November, 1933, the Associates purchased the railroad company and its roadbed.

In 1930 Joint Highway District No. 9, comprised of San Mateo, Santa Cruz and San Francisco Counties, brought a suit[1] to condemn for highway purposes a certain portion of the roadbed (not involved in any of the nine cases). Honorable Maurice T. Dooling, Jr., presided without a jury at the trial and awarded defendants therein a judgment for $112,000. This judgment was affirmed in *Joint Highway*

---

[1]Originally brought in the name of the State of California, but the title was changed to Joint Highway District No. 9.

*Dist. No. 9* v. *Ocean Shore R. R. Co.,* 128 Cal.App. 743 [18 P.2d 413].[2] The district refused to pay the award. Subsequent to the Dooling judgment and in 1931 the Board of Supervisors of San Mateo County raised the assessed valuation of the roadbed in that county over 5000 per cent. An action was brought by the railroad in San Mateo County against the board of supervisors attacking the validity of that assessment. A judgment was obtained therein to the effect that the assessment was illegal and void. On June 24, 1935, the state commenced a suit to condemn for highway purposes a portion of the roadbed in San Mateo County, referred to as the Mussel Rock Bluffs section.[3] September 18, 1935, the railroad filed a motion for change of venue on the ground that a fair and impartial trial could not be had in that county. The two local judges disqualified themselves and Honorable J. J. Trabucco was assigned to hear the motion. On June 15, 1936, he granted the motion transferring the case to Alameda County. His order was affirmed in *People* v. *Ocean Shore R. R., Inc.,* 24 Cal.App.2d 420 [75 P.2d 560]. The case was tried in 1943 and a judgment totaling $515,190 awarded defendants. A motion for new trial was granted on the issue of damages alone. On appeal the portion of the judgment denying the recovery of severance damages and the order granting the new trial were affirmed in *People* v. *Ocean Shore R. R., Inc.,* 32 Cal.2d 406 [196 P.2d 570, 6 A.L.R.2d 1179].

### 1. DID THE COURT ABUSE ITS DISCRETION?

(a) *Fair and Impartial Trial.*

Judge Schottky filed a "Memorandum Opinion and Order Denying Motions For Change of Venue . . ." in which he stated: "That the showing made in support of the motion for change of venue is not sufficient to convince the Court that a fair and impartial jury cannot be obtained in San Mateo before whom defendants cannot have a fair and impartial trial. The lapse of time since the making of the former motion in another case, the increase in the population of San Mateo County and other factors, present a far different situation from the one which obtained at the time of the former motion. If upon the proceedings for the empanelment of a jury it should appear that a fair and impartial

---

[2]This case, for brevity, will hereafter be referred to as the Dooling case.

[3]This case will be referred to as the Mussel Rock case.

jury cannot be obtained in San Mateo County the court would then entertain a renewal of the motion for change of venue.''

Aside from the legal effect of Judge Trabucco's decision, there can be no question that the record in the Mussel Rock case fully supports his conclusion that there was reason to believe that at that time, 1936, a fair and impartial trial could not be had in San Mateo County. It is unnecessary to detail the facts shown in that record. They are well summed up by Mr. Justice pro tem. Ogden in *People* v. *Ocean Shore R. R. Inc., supra,* 24 Cal.App.2d 420, 427: ''By reference to newspaper editorials and articles, by reports of civic meetings and statements made by numerous citizens of the county, the affidavits tend to show a widespread feeling of prejudice extending over a long period of years, both against the officials of respondent corporation and against its cause . . .''

The record supports the conclusion that to and including 1936, through newspaper articles, chambers of commerce and other meetings, actions of county and other officials, the people of San Mateo County were led to believe that the Ocean Shore Railroad was an abandoned one, that its roadbed was practically valueless, that the defendants were determined to exact excessive and unreasonable amounts from the counties, the highway districts and the state or any other body seeking to condemn the roadbed for highway purposes, for the whole or any portion of that roadbed; that the amount awarded in the Dooling case was grossly excessive, and that the defendants were doing everything they could to block and obstruct the completion of the Ocean Shore Highway in order to force payment of excessive prices for the roadbed.

But we are concerned with the situation, not in 1936, but in 1945, when Judge Schottky considered the matter. The newspaper clippings after 1936 do not contain the same venom as found in previous clippings. In the San Mateo County papers after 1936 there appear very few references to the Ocean Shore situation. January 26, 1937, the Burlingame paper stated that ''In another step'' to obtain rights of way for the highway, suit had been brought against the railroad in which the state claims $420 is a fair price for the land sought to be condemned. September 14, 1939, the Half Moon Bay paper published an article entitled ''History of the Ocean Shore Highway'' in which it was stated, in effect, that the attempt to have a fair price set for certain ''rights of way of the defunct Ocean Shore Railroad in San Mateo County'' culminated in an action in eminent domain.

"This litigation appeared to be endless and finally resulted in a decision in which the directors [apparently the joint highway district directors] refused to pay on the ground that the price per mile was inordinate. At this stalemate in the history of the road attempts followed to abandon the proposed route and eliminate the necessity of using all of the Ocean Shore right of way and only adopt part of it." October 18, 1940, two San Mateo County papers referred to the filing of a condemnation proceeding against the railroad "on the property involved in the State Highway project for eliminating the Sharp Park bottle neck." In December, 1940, five county papers stated that the Ocean Shore Railroad ceased operations in 1921 and since had been engaged in "extensive litigation concerning condemnation proceedings for Ocean Shore Hwy." August 6, 1941, a San Francisco paper stated that the new section of the highway "along the former right of way of the old Ocean Shore Railroad eliminates approximately 350 turns." February 7, 1943, a San Francisco paper, referring to the Mussel Rock case, stated that trial of the "long contested State condemnation proceedings against the right of way of the Ocean Shore Railroad" would begin that morning in Oakland, that the case had been transferred there on plea of the attorneys for the "old disused railroad." "Compensation of approximately $6,000,000.00 is sought from the State for the properties, which comprise a right of way now partly in use by the state highway system." April 16, 1943, three San Francisco papers stated the amount awarded the day before to the "old Ocean Shore Railroad" "for violation of right of way." May 26, 1943, a San Francisco paper stated that "Simultaneously with the affirmation of a jury verdict granting $772,595.00 judgment" to the Ocean Shore Railroad, the State Highway Commission had ordered abandonment of a project for improving Highway 99 near Redding because of a Shasta County superior court decision "establishing the right of way costs, which the commission considered excessive." It then stated that a new trial was pending in the Ocean Shore Highway case and that the state's attorneys were hinting that if they lost the appeal to vacate the judgment, this strip might be abandoned, too. The San Francisco papers hereinbefore referred to apparently have a wide circulation in San Mateo County.

In addition to the affidavits on the Trabucco motion defendants filed seven affidavits in which the affiants claimed

that great prejudice still existed in the county against the defendants. Four of these were by disinterested San Mateo County residents. Plaintiff filed some 49 affidavits, most of which were by disinterested San Mateo County residents, in which the affiants claimed that there was no such prejudice.

The weight of the respective affidavits was for the trial court to determine. It is unnecessary to consider the affidavits in detail. A reading of the plaintiff's affidavits together with a study of the newspaper clippings since 1936 supports the conclusion that the entire picture in the county has changed. The highway, which was mostly on paper at that time, has been built and has long since been in use. The bitterness which then existed no longer exists. The population has changed, and while the evidence would possibly have supported a different conclusion had the court reached it, it by no means *compels* such conclusion. In 1934, on the last date of tabulation prior to Judge Trabucco's decision, the qualified electors of San Mateo County were 46,853. On November 1, 1944, the last date of tabulation prior to Judge Schottky's decision, they were 80,873. It is the practice in that county to select trial jurors from the registered qualified electors. Thus the population of the county in the 10-year period had almost doubled. Moreover, by the time these cases get to trial, another eight or more years will have elapsed. The court may take judicial notice of the constantly increasing population in this part of the state. Moreover, the 1930 census gave San Mateo County a population of 77,405, while that of 1940 gave 111,782, and that of 1950, 235,659. It is reasonable to conclude that by the time of trial these figures will be increased substantially.

While it is true that a portion of the cost of the amounts awarded in these condemnation proceedings will be paid by the taxpayers of San Mateo County[4] such fact alone does not constitute a disqualification of the jurors, any more than jurors in certain districts, such as school districts, reclamation districts, etc., would be disqualified in actions in eminent domain brought by such districts.

Section 1963, subdivision 32, Code of Civil Procedure, provides as a disputable presumption that "a thing once proved to exist continues as long as is usual with things of that nature." Defendants contend that this presumption,

---

[4]See discussion hereafter concerning application of section 394, Code of Civil Procedure, for detail.

coupled with Judge Trabucco's opinion, alone compels a reversal. However, the presumption is "satisfactory if uncontradicted," and the evidence justifies the conclusion that it is contradicted. Moreover, the presumption relates to a continuance of a thing "as long as is usual with things of that nature." It is common knowledge that bitterness in a community dies out and that a community seldom remains static, particularly where, as here, there is ever changing population and a tremendous growth. As said in *Pennsylvania R. Co.* v. *City of Reading*, 254 P. 110 [98 A. 791, 792], "the influence of newspaper publications upon the state of the public mind, however potent at the time," is necessarily short-lived. See *Ross* v. *Kalin*, 53 Cal.App. 616 [200 P. 745], where the ruling denying plaintiff's motion for change of venue was affirmed even though the feeling against him some 20 months before the motion was so great in one portion of the county that he was tarred and feathered.

Defendants place great stress upon the fact that at the time of the Trabucco motion the then two judges of the county disqualified themselves and the survivor continues to decline to participate in the case, and argue from those facts that any jurors chosen in the county will likewise feel themselves disqualified. This is a nonsequitur. What the judge's reasons for keeping out of the case are does not appear, but whatever they are, they do not establish that a fair trial cannot reasonably be had in the county.

Plaintiff's affidavits are to the effect that either the affiant has heard no discussions of the acquisition of the Ocean Shore Railroad roadbed for a right of way, or its value, or that if he did it occurred 10 years ago and he had forgotten about it, and that it has not been discussed in that time, nor have there been any local newspaper articles concerning the matter in that time. While there have been newspaper articles within that time, it is clear from them, as hereinbefore set forth, that they were not of an inflammatory nature. Defendents contend that the fact that these people had not heard the matter discussed did not indicate that the prejudice no longer exists. However, that fact is a strong circumstance, particularly as the affidavits show that many of the affiants belonged to or attended groups where the subject, if at all existent, would have been discussed. The weight of these affidavits as compared to those of defendants was for the trial court to determine.

The effect of Judge Schottky's decision is merely to post-

pone until time of trial the consideration of the main question, namely, is there reason to believe that a fair trial cannot be had? Unless the evidence compels the conclusion at this time that it cannot, we cannot say that the court erred. The lapse of time since the bitter campaigns against defendants, the tremendous increase in population, the completion and use of the highway and the other evidence not only does not compel a conclusion contrary to the decision but supports the conclusion reached, namely, that the evidence does not show that *at this time* there is reason to believe a fair trial cannot be had. ██ It cannot be said to be unreasonable that the determination of this matter be left to the time of trial, in view of the rapidly changing conditions and population. In *People* v. *Ocean Shore R. R., Inc., supra,* 24 Cal.App.2d 420, it was pointed out that the procedure of holding in abeyance until time of impanelment of the jury and the voir dire examination of the jurors the determination of whether a fair trial could be had, has been authorized and approved in criminal cases, and by way of dicta in civil cases. The court then stated that such procedure was not the *exclusive* test by which it might be determined whether a fair trial might be had, and then upheld the action of the trial judge in granting the change. It also stated (p. 427): "Whether or not a change of venue should be granted because of reason to believe that an impartial trial cannot be had in the county where the action is properly commenced is a question first addressed to the sound discretion of the trial court. On appeal this court may review such ruling only to the extent of inquiring whether the same constituted an abuse of that discretion. [Citations.] We cannot say that the trial court abused the discretion which is by law vested in it unless it clearly appears that the evidence adduced at the hearing of the motion does not as a matter of law justify such determination. [Citation.]" Although the trial judge in that case came to a contrary conclusion at that time, we do not find that defendants here have met the burden.

We do not construe Judge Schottky's opinion and order, as contended by defendants, as holding that the change could be granted only if, as in the case of *Jacob* v. *Town of Oyster Bay,* 119 App.Div. 503 [104 N.Y.S. 275], there was a *conclusive* showing of prejudice. Judge Schottky obviously had in mind only that the showing had to be such as to give him reason to believe that an impartial trial could not be had.

(b) *Convenience of Witnesses.*

 Judge Schottky stated in his opinion and order that no showing had been made to justify a change for convenience of witnesses. Again, this matter is primarily in the discretion of the court and can only be upset by us if there was an abuse of that discretion. Defendants introduced into evidence the transcript of the trial of the Mussel Rock case to show the witnesses, among others, they propose to call. Affidavits were filed to show the extent of their testimony, ages, residences, and their health. While some of them are to give expert testimony, and therefore their convenience is not to be considered, most of them, including most of the experts, are to give factual testimony. An expert who also testifies as to facts is entitled to consideration on a motion of this kind. (*Security Investment Co.* v. *Gifford,* 179 Cal. 277 [176 P. 444].) Defendants expect to call 36 witnesses whom they deem necessary. Of these, 12 reside in Alameda County, 16 in San Francisco, 4 from Marin, 1 from New Mexico, 1 from Los Angeles, 1 from Benicia, and 1 from Susanville. Plaintiff's affidavits show that of their witnesses 22 are from San Mateo and Santa Cruz Counties. It is unnecessary to detail the facts set forth in the affidavits of the parties. The court undoubtedly considered how much of the proposed testimony was material, how many, if any, of the experts would testify to purely factual matters and just how much inconvenience defendants' witnesses residing outside of Alameda County would suffer in going to San Mateo County for trial instead of to Alameda County. Undoubtedly he balanced the injury to the 12 residents of Alameda County and the other witnesses in going to Redwood City as against that of plaintiff's witnesses. The land is in San Mateo County, and although defendants contend that for view by the jury it is more convenient to go from Oakland to it than from Redwood City, that question is debatable. Frankly, we are not too much impressed by the claim that it is a greater hardship for Marin and San Francisco residents and those from elsewhere than Alameda County to go to Redwood City than to Oakland to attend a trial, nor to bring records from San Francisco. On the defendants rests the burden of proving both that the convenience of witnesses and the ends of justice will be promoted by the removal of the cause. (*Willingham* v. *Pecora,* 44 Cal. App.2d 289 [112 P.2d 328].) Plaintiff proposes to call 22 residents of San Mateo and Santa Cruz Counties. Of these

ll may not be used, depending upon the issues developed at the trial, and upon whether considerable of the testimony proposed to be produced by defendants is admitted. Two of defendants' "main" witnesses are invalids residing in Oakland. One is over 83 years of age. Two of the others living in Oakland also are very old. The Marin County resident is an invalid, 76 years of age. Apparently none of plaintiff's witnesses are in this situation. Under all of the facts of this case we cannot say that the refusal of the court to transfer the case to Alameda County because of these witnesses was an abuse of discretion. It might be pointed out that if these witnesses, as claimed, are so ill that it will be virtually impossible for them to go to Redwood City, by the time this case gets to trial they will not be able even to get to the Oakland courthouse, and their depositions will have to be taken or their testimony on the other trial used.

 Applicable here is the language in *Scott* v. *Stuart*, 190 Cal. 526, 529 [213 P. 947]: "It is no abuse of the trial court's discretion to deny a motion for a change of the place of trial made on the ground of the convenience of witnesses, if the affidavit of the defendant in opposition to the motion shows that his witnesses will be inconvenienced if the change be ordered. (*McNeill & Co.* v. *Doe*, 163 Cal. 338 [125 P. 345].)

"There is no merit in the suggestion that the larger number of witnesses reside in or near the county of Monterey. A mere preponderance in number of the witnesses which either party expects to produce will not necessarily determine the order to be made. (*Reavis* v. *Cowell*, 56 Cal. 588.) Nor will the necessity of producing in this case the records and files in the partition suit and the expense incident thereto settle the question. This, in common with the other matters, is a consideration addressed to the discretion of the court."

### 2. RES JUDICATA

Defendants contend that the Trabucco decision is res judicata. There can be no question but that the doctrine applies to motions for change of venue. "It has been recently held in the case of *Karst* v. *Seller*, 45 Cal.App. 623 [188 P. 298], that as an order of the court granting a motion for change of venue has all the characteristics of a final judgment, and an appeal would lie from such an order, the plaintiff is estopped by such order from bringing another

action *upon the same facts* in the county from which said first action had been transferred, after a dismissal of said first action." (*Fitzhugh* v. *University Realty Co.*, 46 Cal. App. 198, 202 [188 P. 1023]; italics added.) ■■■ "The doctrine does not apply, however, where there are changed conditions and new facts which did not exist at the time of the prior judgment." (*People* v. *Ocean Shore R. R. Inc.*, *supra*, 32 Cal.2d 406, 418.) The proceeding here is not upon the same facts, and the conditions are shown to be changed. "The doctrine of *res judicata* was never intended to operate so as to prevent a re-examination of the same question between the same parties where, in the interval between the first and second actions, the facts have materially changed or new facts have occurred which may have altered the legal rights or relations of the litigants. [Citations.]" (*Hurd* v. *Albert*, 214 Cal. 15, 26 [3 P.2d 545].) The lapse of time and changed conditions distinguish this case from those like *Southern Pac. Co.* v *City of Los Angeles*, 5 Cal.2d 545 [55 P.2d 847]; *Fitzhugh* v. *University Realty Co.*, *supra*, 46 Cal.App. 198; and *Jacob* v. *Town of Oyster Bay*, *supra*, 104 N.Y.S. 275.

### 3. SECTION 394, CODE OF CIVIL PROCEDURE.

■■■ Joint Highway District No. 9, comprises the counties of San Mateo, Santa Cruz and the city and county of San Francisco. It was formed to construct a public highway from San Francisco to Santa Cruz, to be known as the Ocean Shore Highway. The general route of said Ocean Shore Highway was designated in 1933 by the California Highway Commission as State Highway Route 56. On February 27, 1936, the district entered into an agreement with the Department of Public Works of the State of California. This agreement states that the district desires the cooperation of the department in the construction of the Pedro Mountain sector from Farallone City to Rockaway Beach, a length of approximately 5.90 miles, estimated to cost for right of way and construction $425,000. The district agrees to contribute $125,000 of its funds, also to provide all funds in excess of $50,000 which the right of way, and removal or change of buildings or improvements on it, damages to property, court costs and other expense incidental to providing a right of way, clear of obstruction or encumbrances, might cost. Certain sums have been expended out of the $50,000 for acquisition of rights of way of certain portions of the

Farallone City-Rockaway project, leaving a balance in the fund of approximately $15,000 only. It may be assumed that this sum will nowhere near cover the awards which defendants will get in these cases. Defendants point out that the district will have to pay this excess and that San Mateo County must pay 30 per cent thereof. There is evidence that in addition to the district's liability under the contract before mentioned it has assumed or will assume large additional sums to pay to the state for the construction of the Ocean Shore Highway, and San Mateo County will have to pay 30 per cent thereof. They contend that the county's share will have to be raised by *direct* taxes. Whether this is true, or as contended by plaintiff it will come out of the county's share of state gas tax monies, is immaterial. Because of this liability defendants contend that although the actions are by the state to condemn lands for a state highway, the county is a party in interest, and therefore section 394 should apply. The portion of that section which they desire applied here states that "Whenever an action or proceeding is brought by a county . . . against a resident of another county . . . or a corporation doing business in the latter, the action or proceeding must be, on motion of either party, transferred for trial . . ." to a neutral county. Defendants argue that because of its financial interest in the outcome of the case this action is, in effect, "brought" by that county. Obviously, neither the district nor the county appear on the pleadings to be *bringing* the action. The question for us to determine is whether for the purposes of that section this action may be deemed to be brought by the county. ▮ It must be borne in mind that it is for the Legislature to determine where venue shall lie. "The place of trial for all actions not governed by constitutional mandate may be fixed by the Legislature." (*People* v. *Zegras*, 29 Cal.2d 67, 68 [172 P.2d 883].) The Legislature, in many instances, has not provided for change of venue in cases where the plaintiff public entity has the complete financial responsibility. Such situations, for example, are reclamation, irrigation, and other special districts. ▮ Therefore, we must determine here whether the Legislature intended that section to apply to a case where, as here, the interest of the county is twice removed from the entity bringing the suit. "In Black's Law Dictionary, 2d Ed., the phrase 'bring suit' is defined as follows: 'To "bring" an action or suit has a settled customary meaning at law, and refers to the initiation of legal proceed-

ings in a suit." (*W. J. Lake & Co.* v. *King County*, 4 Wn.2d 651 [104 P.2d 599, 601]; see, also, 11 C.J.S. 1141.) Thus, "Whenever an action is brought by a county" means initiated, started or commenced. If the Legislature had intended the section to apply whenever a county has an indirect interest in an action, it could easily have said so. In *Metropolitan Water Dist.* v. *Superior Court*, 2 Cal.2d 4 [37 P.2d 1041], cited by both parties, the question was whether the superior court judges of Riverside County were disqualified in that action by reason of section 170 of the Civil Code, subdivision 6, which provides, in part, that in any action "brought" by or against the Reclamation Board of the state, or any irrigation, reclamation, levee, swamp land or drainage district "or any public agency" or their officers, affecting or relating to any real property, or an easement, right of way, levee, embankment, canal, or any work provided for or approved by the Reclamation Board, a judge of the county in which the real property or the other matters mentioned is located shall be disqualified to sit in the action. It was contended that this section, by reason of the words "or other public agency" applied to the plaintiff, the Metropolitan Water District of Southern California, which is comprised of several municipalities. However, the court pointed out, first, that under the then law the cities comprising the district might bring actions either separately or jointly and the judges of the county wherein the property was situated would not be disqualified; therefore, where they acted through a common instrumentality or agency the Legislature could not be held to have contemplated that the judges would be disqualified. Secondly, the very language of the section indicates that only agencies dealing with the subject of reclamation work were included in the term "other public agency" and did not include any agency like the water district which more closely resembles a municipal corporation than a state agency such as irrigation and reclamation districts. The court then held that the judges were not disqualified. The case shows that it is not the policy of the Legislature that all actions affecting a public body be tried in a neutral county.

The fact that as to actions by certain agencies the Legislature has provided authority for removal, and not as to others, indicates that the Legislature did not intend that indirect interest in the outcome of the action should cause a transfer as to all public agencies.

While it is true that district No. 9 is comprised of

three counties, it is not a "county" but a "public corporation." (See Stats. 1917, p. 47, § 7.) It is a "legal kind of taxing district" (*Joint Highway Dist. No. 13* v. *Hinman*, 220 Cal. 578, 584 [32 P.2d 144].) In that case it was held that the collection of a tax for the purpose of constructing a public highway and tunnel between Contra Costa and Alameda Counties was "for a state purpose—the development of the highway system of the state . . ." (P. 588.) There the district directors levied the tax by fixing the amount to be raised, and notifying the boards of supervisors of the counties comprising the district. These boards then caused "the amount to be collected by a tax upon and from the taxable property in the county." (P. 583.) ▇▇▇ Even though, as contended by defendants, the counties which originally desired the Ocean Shore Highway built had adopted for that purpose the method of forming a district and then persuading the state to bring the condemnation actions, still the purpose is a state one—the development of the state highway system. The fact that had the action been brought in the name of the county a removal of the cause would have been required, in nowise changes the situation that being brought by the state it is neither a district nor county project, but a state one. In a great many of the projects for the development of our state highways there is contribution to the state from one or more counties or municipalities. The Legislature has provided for such contributions. (Sts. & Hy. Code, § 130.) Had the Legislature intended that where such contributions are made, actions for condemnation should be removable, it could easily have said so. But it did not. Defendants contend that a highway district is merely the *alter ego* of the counties comprising it, and cite many sections of the Streets and Highways Code showing the relationship of the boards of supervisors and the counties to the district and its directors. It is not necessary to discuss these sections. In spite of a close relationship between the counties and the district the latter is a distinct entity—as pointed out before, "a public corporation." See *Joint Highway Dist. No. 13* v. *Hinman, supra,* 220 Cal. 578; *Turlock Irr. Dist.* v. *White,* 186 Cal. 183 [198 P. 1060, 17 A.L.R. 72] (which distinguishes between a public corporation and a municipal corporation). See, also, *Sharp* v. *Joint Highway Dist. No. 6,* 111 Cal.App. 81 [295 P. 841], where the court refused to uphold the contentions that the statute authorizing the highway district to issue bonds was merely a subterfuge for the

counties, as the district's powers are merely the powers of the several boards of supervisors and was "but a sham for giving some support to the issuance of the bonds." (P. 85.) *Yuba County* v. *North America Consol. Gold Min. Co.*, 12 Cal.App. 223 [107 P. 139], and *City of Stockton* v. *Ellingwood*, 78 Cal.App. 117 [248 P. 272], are not in point as there the plaintiff in the first case was a county, and in the other a city. Both came within the specific wording of section 394, Code of Civil Procedure. The Legislature having provided expressly for county participation in state highway projects and having failed to provide for removal of actions brought by the state in such situations, the courts have no right to determine as a matter of law that such removals must be granted.

### 4. ALLEGED DISQUALIFICATION OF JUDGES

 We have herein stated that the two San Mateo County judges, incumbents in 1936, had disqualified themselves. This is based primarily upon a statement in a letter from one of them to the Judicial Council in 1944. It may be doubtful if they were disqualified. In a proceeding brought in 1936 to disqualify one of them it was held that he was not disqualified. Assuming, however, that they were disqualified in fact, such fact does not require, as contended by defendants, the removal of the cause. In the first place, of the three judges now in San Mateo County, one became such in 1945 and the other in 1949. There is no evidence that they are disqualified. Secondly, even if all the judges are disqualified, such situation does not require a removal. A qualified judge may be assigned for the trial, just as was done in connection with the motions to transfer. See *Matter of Application of Burch*, 168 Cal. 18 [141 P. 813], and *Yolo Water & Power Co.* v. *Superior Court*, 28 Cal.App. 589 [153 P. 394]. *People* v. *McKay*, 37 Cal.2d 792 [236 P.2d 145], does not hold to the contrary. There, in reversing the denial of a change of venue it appeared that in addition to the "intense antagonism of the community toward defendants, . . . the regular trial judge has forcefully presented his opinions as to the merits of the case and attacked the good faith of defense counsel . . ." (P. 800.) The trial judge "was well known in the county and had been the only regular superior court judge for approximately 17 years. . . . His opinions were known to members of the jury. Under such circumstances the prejudicial effect of his statements was not materially less because they were made outside rather

than inside the courtroom.'' (P. 799.) There is no similarity between that situation and the one in the case at bar.

The order is affirmed.

Peters, P. J., and Wood (Fred B.), J., concurred.

The opinion was modified to read as above printed on March 14, 1952. A petition for a rehearing was denied April 11, 1952, and appellants' petition for a hearing by the Supreme Court was denied May 8, 1952.